IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| GLOBAL INTERNATIONAL, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:15-CV-0677-N |
| | § | |
| PROBALANCE, INC., | § | |
| | § | |
| Defendant. | § | |

# FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case proceeded to trial before the Court on August 22-24, 2016. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, this constitutes the Court's findings of fact and conclusions of law.

## I. FINDINGS OF FACT

### A. Parties

1. Plaintiff Global International LLC, formerly known as United I International Laboratories LLC ("Global") is a Texas limited liability company with its principal place of business in the State of Texas. Its member is United Interests LLC, an Oklahoma limited liability company. The members of United Interests LLC are Joe Cooper and Mary Cooper, both citizens of Oklahoma. It appears at the time suit was filed that George Mitchell, a citizen of Texas, may also have been a member of Global. *See* Complaint ¶ 1.

2. Defendant ProBalance, Inc. ("ProBalance") is a Delaware corporation with its principal place of business in Florida.

3. The amount in controversy exceeds $75,000.

### B. Standing

4. This dispute arises out of unpaid invoices for product that Global manufactured for ProBalance. At that time, Global was known as United I International Laboratories LLC. Effective January 1, 2014, after the events at issue in this case, Global sold its assets to United Laboratories Manufacturing, LLC ("ULM"), including its name, and changed its name to Global. The sale of assets to ULM included the invoices at issue in this case. After ULM experienced difficulty collecting on those invoices, it assigned the invoices back to Global for good and valuable consideration. At all pertinent times during the pendency of this action Global has owned the invoices in question.

### C. Background

5. This lawsuit arises out of a relatively short contractual manufacturing relationship between ProBalance and Global. In 2011, ProBalance entered into the nutritional supplement business selling drinks that provided dietary protein. ProBalance's niche in the market was to provide convenient small drinks ("shots") that contained a relatively large amount of protein as compared to other market entrants. ProBalance contracted with a manufacturer to make its products and contracted with various distribution channels to sell its products, including grocery and convenience stores, pharmacies, and health clubs.

6. In 2012, ProBalance began experiencing problems with its prior vendor. In September 2012, ProBalance entered into an agreement with Global for Global to

manufacture some of ProBalance's products. There was no written master agreement setting forth terms and conditions, or more significantly product specifications. Rather, the relationship was documented by a series of purchase orders.

7.     ProBalance provided Global with the formulation for its drinks. Global took some responsibility for the flavoring formulation, but ProBalance was primarily responsible for the formulation. ProBalance's primary product at the beginning with Global was a 2.5 oz. "protein shot" with 28 grams of protein. Most other vendors in the market for that size product included around 12-14 grams of protein. ProBalance also specified an animal-derived protein source that was difficult to formulate with a pleasant flavor. Because of the relatively large volume of protein and the type of protein, it was difficult to make ProBalance's products taste good. That was not Global's fault. To that extent, Global was simply manufacturing according to the recipe that ProBalance required.

8.     ProBalance also required the use of natural flavors. Some of the natural flavors varied from batch to batch due to the variability inherent in natural products. Some, but not all, of the variability of flavor is attributable to this inherent variability. Some, however, is also attributable to variations in Global's manufacturing process.

9.     During the relatively short relationship between ProBalance and Global, ProBalance received various customer complaints about the product. These included: bad taste, variable product, leaking product, and foaming or fizzing product. There was some overlap between the leaking and the foaming and fizzing. Some of the product both leaked

and fizzed, but some that did not leak nonetheless fizzed when opened. The product was not intended to be carbonated or sparkling.

10. Global had standard operating procedures ("SOP") that required it to complete various documentation regarding its processes. Some of those were required by government regulation. In several pertinent instances Global failed to follow its SOPs in connection with its ProBalance contract(s). Global's failure to follow its SOPs in some cases has interfered with the Court's efforts to determine what actually happened. These failures do not appear to have been a deliberate attempt to conceal evidence and do not approach anything resembling spoliation. Likewise, these failures do not appear to have contributed in any way to the customer complaints regarding ProBalance products.

11. ProBalance was correspondingly imprecise in its dealings under the contracts with Global. When products were returned from customers, ProBalance did not return those products to Global or even necessarily notify Global of the defects. Likewise, ProBalance did not keep accurate records of what products were returned for what reasons. Nor did ProBalance retain the returned products. These failures made it impossible for Global, and of necessity the Court, to determine exactly what happened with the products, what was the nature and extent of any defects of deficiencies, and whether Global or one of its successors in fact manufactured the returned products.

12. The unappetizing taste of some of the Global-manufactured ProBalance product was not the result of a product manufacturing defect, but rather simply reflected the nature of the product – in some instances it just did not taste very good.

13. Around December 2013, ProBalance replaced Global as a supplier.

### *D. Sworn Account*

14. Global's sworn account claim relates to the fourteen invoices in Plaintiff's Exhibit 14 (the "Invoices"), dated from October 2, 2013 to December 20, 2013, in the total amount of $376,452.72.

15. Global did not manufacture product for ProBalance unless and until ProBalance submitted a purchase order ("PO") for the product to Global. Upon receipt of the PO, Global would proceed to manufacture the product for ProBalance. ProBalance was free to inspect and sample Global's product before accepting it and did on several occasions inspect and sample to product. Upon manufacturing, Global would hold the completed product in its warehouse for pickup by ProBalance's designated shipper. Some of the completed product was shipped to ProBalance in Florida, and some was drop-shipped directly to ProBalance's customers. The term of delivery was free on board ("FOB") at Global's warehouse. This basically means that delivery is complete when ProBalance's shipper collects the product from Global's warehouse, and ProBalance is responsible for shipping and any associated risk of loss. Upon delivery to ProBalance, Global would issue an invoice to ProBalance for the delivered product.

16. All of the Invoices reflect product that was manufactured and delivered in accordance with this process. That is, Global manufactured the product referenced in the Invoices in response to POs issued to Global by ProBalance. All of the product reflected in

the Invoices was delivered to ProBalance FOB Global's warehouse. Global and ProBalance agreed to the price of the product, as reflected in the Invoices

17. Upon receipt of the Invoices, ProBalance entered the Invoices into its computerized accounting system (except Invoice 9472). This indicates that at the time, ProBalance agreed that it had ordered the product from Global, Global had manufactured and delivered the product to ProBalance, and the amount of the Invoices was due and owing from ProBalance to Global.

18. There are some discrepancies in the invoices, including references to Australia and 2.5 oz. bottles after ProBalance had quit selling to Australia and had moved to 3 oz. bottles. These are puzzling and the Court is not able definitively to state a reason for those discrepancies. On balance, however, the Court finds that it is more likely than not that the invoices still reflect product that ProBalance ordered and that Global manufactured and delivered.

19. Around October 2013, ProBalance rejected a 200,000 bottle run. The Invoices do not include any of the rejected 200,000 bottle run.

20. Some of the shipped product leaked during shipment. This was due to a combination of excess liquid nitrogen and imperfect lid application. Product that leaked was defective. It is impossible for the Court to say definitively what portion of the product leaked. On balance the Court finds it more likely than not that ten percent (10%) of the product leaked.

21. Product that fizzed but did not leak was not defective. The fizzing was simply due to excess liquid nitrogen added before sealing the bottles. Fizzing did not affect the taste or any other salient characteristic of the product. Product that tasted bad was not defective, but rather reflected ProBalance's formulation. Not any of the product reflected in the Invoices was contaminated.

22. Beyond the 10% of leaky product, ProBalance did not establish that any of the product subject to the Invoices was defective at the time of delivery. Retailers returned product because: it did not sell well (probably due to the flavor); because of the migration to the 3 oz. size; because customers did not like the fizzing; and because of the transition to Protein 15. These reasons do not establish a defective product at the time of delivery.

### *E. ProBalance's Counterclaims*

23. ProBalance failed to show by a preponderance of the evidence the amount of any product manufactured by Global that was returned by ProBalance's customer due to any defect in the product, other than the approximately 10% that leaked. The other 90% of the product subject to the Invoices was merchantable and not defective.

24. ProBalance did not notify Global of any defect in the product within a reasonable time after ProBalance became aware of any alleged defect. Consequently, Global did not have any opportunity to inspect the allegedly defective product.

25. ProBalance failed to establish the amount of any lost profits, loss of reputation, or loss of goodwill with reasonable certainty by a preponderance of the evidence. ProBalance was at the time a relatively new business and whether it would make any profits

is very speculative. ProBalance did not prove any amount of damages (other than the offset for leaking bottles) with any degree of reasonable certainty.

26. ProBalance's purchases of product from Global constitute a set of transactions relating to the same project. Those purchases involved consideration in excess of $500,000, in fact in excess of $1,000,000.

27. All findings of fact that are more properly considered to be conclusions of law are also adopted by the Court as conclusions of law.

## II. CONCLUSIONS OF LAW

1. The Court has subject matter jurisdiction over this action and personal jurisdiction over the parties.

2. Global owns the Invoices and has standing to seek payment of the Invoices.

3. Global manufactured the product reflected in the Invoices at the request of ProBalance. Global and ProBalance agreed to the price for the product as shown in the Invoices. The product reflected in the Invoices was delivered to ProBalance FOB at Global's facilities. Not any of the product reflected in the Invoices was timely rejected by ProBalance.

4. Approximately ten percent (10%) of the product reflected in the Invoices was defective due to leaking. ProBalance is entitled to a ten percent (10%) offset on the amount of the Invoices due to that defect.

5. ProBalance is not otherwise entitled to any offset or credit against the Invoices. The balance of the Invoices remain due and unpaid. Global has made demand on ProBalance for payment of the Invoices more than thirty (30) days before trial.

6.  After allowing for all just and lawful offsets or credits, Global is entitled to recover from ProBalance on its open account claim in the amount of:

$367,452.72 - $36,745.27 = $330,707.45

7.  Global is entitled to prejudgment interest. *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 528 (Tex. 1998). Global asserted its claim on March 3, 2015, *see* Plaintiff's Exhibit 49, and filed this action on March 2, 2015. Accordingly, prejudgment interest runs from March 2, 2015 (the earlier of 180 days after written notice or the date suit is filed). *Johnson & Higgins*, 962 S.W.2d at 530-31. The Court takes judicial notice that the prime interest rate is currently 3.5%. Accordingly, the prejudgment rate is 5%. *See* TEX. FIN. CODE § 304.003(c); *Johnson & Higgins*, 962 S.W.2d at 530-31. Prejudgment interest is thus:

$330,707.45 * 5% * (618/365) = $27,996.88

8.  Aside from the offset above, ProBalance failed to prove any breach of contract by Global. ProBalance failed to prove any of the product subject to the Invoices was defective or not merchantable, aside from the offset for leaking bottles.

9.  Global tendered delivery of the product subject to the Invoices to ProBalance FOB Global's facility. ProBalance accepted the product subject to the Invoices. ProBalance thereafter failed to notify Global of any alleged breach of the implied warranty of merchantability within a reasonable time, and Global was actually prejudiced by that failure to notify. *See* TEX. BUS. & COMM. CODE § 2.607(c)(1); *Martin v. Home Depot U.S.A., Inc.*, 369 F. Supp. 2d 887, 893 (W.D. Tex. 2005).

10. Other than the offset for leaking bottles, ProBalance failed to prove its damages, if any, from any breach of contract with reasonable certainty.

11. Other than the offset previously allowed, ProBalance failed to prove it is entitled to recover from Global on ProBalance's claim for breach of implied warranty of merchantability.

12. Section 17.49(g) of the Texas Deceptive Trade Practices Act ("DTPA") provides:

> Nothing in this subchapter [the DTPA] shall apply to a cause of action arising from a transaction, a project, or a set of transactions relating to the same project, involving total consideration by the consumer of more than $500,000, other than a cause of action involving a consumer's residence.

TEX. BUS. & COMM. CODE § 17.49(g).

13. As this Court held in *SPRAJ Properties LLC v. Regions Bank*, 2015 WL 11120528, (N.D. Tex. 2015):

> [Plaintiffs'] argument is foreclosed by section 17.49(g)'s language excluding from the DTPA any "set of transactions relating to the same project" with value of over $500,000. TEX. BUS. & COM. CODE ANN. § 17.49(g). Although the DTPA does not define "project," the Court interprets that term in light of section 17.49(g)'s purpose of "remov[ing] from the scope of the [DTPA] . . . litigation between big businesses." *Citizens Nat'l Bank v. Allen Rae Invs., Inc.*, 142 S.W.3d 459, 473 (Tex. App – Fort Worth 2004, no pet.) (ellipses in original). In *Fidelity Telealarm, L.L.C. v. Silver Resources Inc.*, 2004 WL 1047661 (E.D. Pa. 2004) the court, applying the Texas DTPA, defined "project" as a "planned undertaking," and held that a long running distribution relationship between two parties constituted a project. *Id.* at *7.

*Id.* at *6.

14. Likewise here the manufacturing and distribution relationship between the two parties constitutes a "project" within the meaning of section 17.49(g). This relationship

obviously did not involve a consumer's residence. This set of transactions involved total consideration by ProBalance of more than $500,000.

15. The Texas DTPA does not apply to ProBalance's claims against Global. ProBalance is not entitled to recover against Global under the Texas DTPA.

16. It appears that Global may be entitled to recover its attorneys' fees in connection with its claim for open account. Global shall move for such fees in accordance with Federal Rule of Civil Procedure 54(d)(2).

17. All conclusions of law that are more properly considered to be findings of fact are also adopted by the Court as findings of fact.

Signed November 9, 2016.

_____
David C. Godbey
United States District Judge